UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **STUART LABORDE ET AL** | **CASE NO. 1:23-CV-01315 LEAD** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **HUNT OIL CO** | **MAGISTRATE JUDGE PEREZ-MONTES** |

## MEMORANDUM RULING

Before the Court is a Motion for Partial Summary Judgment filed by Defendant Hunt Oil Company ("Hunt Oil") [Doc. No. 21]. Plaintiffs Stuart and Allison Laborde ("the Labordes") and Plaintiffs Glendon and Dana Normand ("the Normands") (collectively "the Landowners") opposed the Motion [Doc. No. 25]. Hunt Oil filed a Reply [Doc. No. 26], and the Landowners filed a Surreply [Doc. No. 30].

For the reasons stated below, Hunt Oil's Motion is **GRANTED**.

### I. FACTS AND PROCEDURAL HISTORY

This suit is about alleged environmental contamination plaguing the properties of two families.[1] Hunt Oil previously operated oil and gas wells on land in Avoyelles Parish, Louisiana until one well was plugged and abandoned on July 13, 1953, and another was plugged and abandoned on September 29, 1956.[2] At some point, the Labordes and Normands purchased properties on these lands.[3] However,

---

[1] [Doc. No. 21-1, p. 1].
[2] [Id.].
[3] [Id.].

1

Hunt Oil had not conducted any operations on these properties since the September of 1956 plugging.[4]

On March 29, 2022, the Labordes sent a letter to Hunt Oil and the Louisiana Office of Conservation titled "Notice to Investigate Potential Environmental Damage to Property Arising from Activities Subject to the Jurisdiction of the Louisiana Department of Natural Resources, Office of Conservation," and stated the following:[5]

> We believe that adjacent tracts of land located in Sections 56 and 83, Township 2 N, Range 4 E of Avoyelles Parish described in more detail below have been contaminated by negligent oil and gas operations which are subject to Office of Conservation jurisdiction. The environmental damage is believed to arise from the migration of contaminants resulting from the drilling and operation of unit wells SN 37964 and SN 37548 on the property by Hunt Oil Co. as well as pits associated with those unit operations. The potential environmental damage to our clients' properties includes soil and groundwater contamination due to leaks, spills, and other discharges of produced saltwater, drilling fluids, hydrocarbons, and other contaminants associated with the drilling and production of these wells. The potential contaminants include salts, heavy metals, and radioactive materials.[6]

Around two weeks later on April 14, 2022, the Normands sent a similar letter to Hunt Oil.[7] The Landowners eventually sued Hunt Oil in the 12th Judicial District, Avoyelles Parish, Louisiana on August 28, 2023.[8] The case was properly removed to this Court on September 22, 2023, on the basis of diversity.[9] The Landowners alleged violations of the Louisiana Environmental Quality Act ("LEQA"), La. R.S. 30:2001,

---

[4] [Id. at p. 2].
[5] [Id. at p. 3].
[6] [Doc. No. 21-7].
[7] [Doc. No. 21-8].
[8] [Doc. No. 1, p. 1].
[9] [Id.]. This suit was originally brought by the Labordes until it was consolidated with the Normands' suit, *Glendon and Dana Normand v. Hunt Oil Company*, Civil Action No. 1:23-CV-1316. The Normand's original suit was filed in the same court and on the same day as the Labordes' [Doc. No. 18].

*et. seq.*, claiming that Hunt Oil's historic oil and gas operation environmentally contaminated and damaged their properties.[10]

On April 7, 2025, Hunt Oil filed the pending Motion.[11] Hunt Oil seeks to toss out two types of claims brought by the Landowners: (1) any claims pursuant to LEQA, and (2) any claims to recover civil penalties, attorney's fees, and damages under Louisiana's Conservation Laws[12] ("Conservation Laws").[13]

The issues have been briefed, and the Court is prepared to rule.

## II. LAW & ANALYSIS

### A. Standard of Review

A court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant meets their initial burden of showing no genuine issue of material fact, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (cleaned up). A fact is "material" when proof of its existence or nonexistence would affect the lawsuit's outcome under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "the mere existence of *some* alleged factual dispute will not defeat an otherwise properly

---

[10] *See generally* [Doc. No. 1].
[11] [Doc. No. 21].
[12] "Conservation Laws" refers to the provisions of the Louisiana Revised Statutes found in Title 30, Subchapter 1, and specifically include Louisiana Revised Statutes 30:14 and 30:16.
[13] [Doc. No. 21-2, p. 2].

3

supported motion for summary judgement." *Id.* at 247-48. And a dispute about a material fact is "genuine" only if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). But summary judgment is appropriate when the evidence is "merely colorable or is not significantly probative." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (cleaned up).

Moreover, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (cleaned up). Courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).

Finally—and importantly—there can be no genuine dispute as to a material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Hunt Oil's Motion

Hunt Oil seeks summary judgment for (1) any claims pursuant to LEQA, and (2) any claims to recover civil penalties, attorney's fees, and damages under Louisiana's Conservation Laws.[14] Moreover, Hunt Oil accuses the Landowners of incorrectly confusing and combining claims and remedies under the two statutes to such an extent "that their legal arguments cannot stand."[15]

Hunt Oil says that any claims brought under LEQA "is a separate and distinct cause of action" from claims brought under the Conservation Laws.[16] The two provisions "are not interchangeable and are not connected in any way."[17] The Landowners appear to agree.[18] So the Court will address each statute separately.

### 1. The Louisiana Environmental Quality Act

LEQA establishes "most of [Louisiana's] pollution control and environmental remediation laws." Kenneth M. Murchison, *Enforcing Environmental Standards Under State Law*, 57 La. L. Rev. 497, 499 (1997). It "combines state legislation regarding air and water pollution, the management and disposal of solid and hazardous waste, and releases of hazardous substances into one comprehensive act." *Id*. (internal footnotes omitted). What's more, the Act established the Department of Environmental Quality, "the primary agency in the state concerned with environmental protection and regulation," to administer the statute's mandates. *Id*.

---

[14] [Id.].
[15] [Id. at p. 1].
[16] [Id.].
[17] [Id.].
[18] *See* [Doc No. 25, p. 23] "Thus, even if Plaintiff's LEQA claims were prescribed (which they are not), the claims under [the Conservation Laws] would remain viable."

(citing La. R.S. 30:2011(A)). LEQA also provides a citizen suit provision, La R.S. 30:2026, which permits citizens "to enforce the act when the Louisiana Department of Environmental Quality fails to do so or does an inadequate job." *Salvation Army v. Union Pac. R.R. Co.*, 403 So. 3d 80, 86 (La. App. 3rd Cir. 2024).

The Landowners seek relief under LEQA's citizen suit provision on the basis that Hunt Oil's prior oil and gas operations allegedly caused "contamination"[19] and "environmental damage"[20] to the Landowners' properties. Hunt Oil says that the LEQA claims have prescribed[21] whereas the Landowners disagree on two grounds. First, the Landowners point to La. R.S. 30:29(B)(7) (hereinafter "Remediation Law"), which allegedly "suspended the prescriptive period" when the Landowners sent its Notices of Intent to Investigate ("the Notices").[22] Second, the Landowners claim that a genuine issue of material fact exists as to when the prescription period began.[23]

### i. The Prescription Period

A LEQA claim to recover damages involving immovable property is "akin to a tort based claim and [is] therefore subject to a one year prescriptive period" under Louisiana Civil Code Article 3493. *Daigle v. Cimarex Energy Co.*, 333 F. Supp. 3d 604, 616 (W.D. La. 2018). The "one-year prescription commences to run from the day the

---

[19] [Id. at p. 7].
[20] [Id. at p. 10].
[21] Alternatively, Hunt Oil claims that the Landowners do not have a valid LEQA claim because the underlying regulatory statutes cannot be retroactively applied to Hunt Oil and its operations on the relevant properties, which date as far back as the 1940s.
[22] [Doc. No. 25, p. 9].
[23] [Id. at p. 10].

owner of the immovable [property] acquired, or should have acquired, knowledge of the damage." La. CC. art. 3493.[24]

Hunt Oil claims that the Landowners' knowledge of the alleged damages—and the prescription clock for their LEQA claims—began when the Landowners sent their Notices to Hunt Oil on March 29, 2022 and April 22, 2022.[25] Since the Landowners waited until August 29, 2023 to file suit, Hunt Oil says that the LEQA claims are time-barred.[26] But the Landowners paint the scene differently: the Notices actually *suspended* the prescription period rather than triggered it.[27] The Landowners point to the Remediation Law, which suspends the prescription period for "one year upon the mailing or physical delivery…of a notice of intent to investigate." La. R.S. 30:29(B)(7). Thus, the Landowners insist that their Notices suspended LEQA's prescription period and their suit was filed "well within one year from the end of these suspension periods."[28]

The Landowners' assurance that the Remediation Law has a bearing on LEQA is misplaced. For starters, the Landowners failed to provide a single authority that agrees. But the dearth of supportive authority is not fatal in of itself. The "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024) (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)). "Of course, statutes cannot be viewed in isolation, and

---

[24] As of July 1, 2024, La. Civ. Code Article 3493 was repealed and replaced. However, the change does not affect the present case since the repeal only has prospective effect.
[25] [Doc. No. 21-2, p. 10].
[26] [Id.].
[27] [Doc. No. 25, p. 4-5].
[28] [Id. at p. 10].

7

statutory interpretation requires considering the context and structure of the overall statutory scheme." *Kovac*, 109 F.4th at 335; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 143 (2012) ("Perhaps no interpretive fault is more common than the failure to…consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). In this instance, a plain and contextual reading of the two provisions tarnish the idea that one affects the other.

The Remediation Law states that the "prescriptive period that applies to any claim covered by the provisions of *this* Section shall be suspended for a period of one year…." La. R.S. 30:29(B)(7)(A) (emphasis added). The statute's relevant terms very explicitly limit its reach to provisions within its "Section." What's the problem? The Remediation Law and LEQA aren't in the same section. In fact, the Remediation Law falls under a different Subtitle, a different Chapter, and a different Part from LEQA. *See* Scalia & Garner, *Reading Law* at 180 ("The title and headings are permissible indicators of meaning."). Also, the Landowners quote (and bolden) the Remediation Law establishing "the procedure for judicial resolution of claims for environmental damage to property arising from activities subject to the jurisdiction of the Department of Energy and Natural Resources, office of conservation."[29] (attorney's boldening omitted). But that does not save the Landowners because LEQA authorized the power to enforce *its* provisions to the Department of Environmental Quality—not the Department of Energy and Natural Resources. La. R.S. 30:2011(A)(1).

---

[29] [Doc. No. 30, p. 2]

The Remediation Law and LEQA differ substantively as well. While the Remediation Law allows a temporary suspension of prescription, LEQA's citizen suit provision does not call for a similar privilege. *See* La. R.S. 30:2026(B). Likewise, the Remediation Law and LEQA differ in their filing and notice requirements. A LEQA citizen suit cannot be filed until "thirty days after the plaintiff has given written notice of the violation to the secretary and to any alleged violator…." La. R.S. 30:2026(B)(1). Meanwhile, the Remediation Law only requires that the plaintiff "shall provide timely notice [of the suit] to the state of Louisiana through the Department of Energy and Natural Resources, commissioner of conservation and the attorney general." La. R.S. 30:29(B)(1). The two statutes also differ in their approach to recouping damages. LEQA's penalties "shall be awarded to and collected by the state of Louisiana and deposited into the state treasury." La. R.S. 30:2026(A)(3). However, the Remediation Law states that "all damages or payments in any civil action…shall be paid exclusively into the registry of the court in an interest-bearing account with the interest accruing to the account for clean up." La. R.S. 30:29(D)(1).

Be that as it may, the Landowners suggest that their interpretation of the Remediation Law "advances the [Louisiana] Legislature's stated purpose."[30] But "[t]he starting point in the interpretation of any statute is the language of the statute itself, because what the legislature says in the text of a statute is considered the best evidence of legislative intent." *Gulley v. Hope Youth Ranch*, 221 So. 3d 21, 26 (La. 2017) (citation omitted). And "[w]hen a law is clear and unambiguous and its

---

[30] [Id. at p. 3].

9

application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Cod. Ann. art. 9; *see also* Scalia & Garner, *Reading Law* at 183 ("interpretation clauses are to be carefully followed."). In this instance, the LEQA and the Remediation Law texts are clear and unambiguous. So the statutes' words—and nothing more—will serve as both the starting point and endpoint in this Court's interpretation analysis.

With all that said, a plain reading and comparison of the two provisions shows that these are two different statutes. Though the Remediation Law and LEQA share the concern of protecting the environment, there's no textual evidence that one governs the other. Thus, the Remediation Law and its suspension provision have no bearing on the one-year prescription period for LEQA claims.

### ii. The Start of the Prescription Period

Determining that a LEQA claim is subject to a one-year prescription period that cannot be suspended through the Remediation Law only solves half the problem. The Landowners also claim that "genuine issues of material fact exist" as to when each Landowner obtained sufficient knowledge to start the prescription period.[31]

As already mentioned, the "one-year prescription commences to run from the day the owner of the immovable [property] acquired, or should have acquired, knowledge of the damage." La. CC. art. 3493. The injured party's knowledge of the damage may be either actual or constructive. *Hogg v. Chevron USA, Inc.*, 45 So. 3d

---

[31] [Doc. No. 25, p. 10].

991, 997 (La. 2010). Constructive knowledge means "whatever notice is enough to excite attention and put the injured party on guard or call for inquiry." *Id.* "In assessing whether an injured party possessed constructive knowledge sufficient to commence the running of prescription," the Court must consider "the reasonableness of the injured party's action or inaction in light of the surrounding circumstances." *Id.* at 997–98. Nor does the injured party need to have *all* of the facts. The relevant question is whether the known facts constitute "the acquisition of sufficient information, which, if pursued, will lead to the true condition of things." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 284 (La. 2010).

The Landowners acknowledge that they sent Hunt Oil the two Notices.[32] Still, they maintain that they did not have actual or constructive knowledge of the damages outside of the prescription period.[33] Yet the detailed specificity of these Notices is damning. The Notices revealed that the Landowners' properties were "contaminated by negligent oil and gas operations,"[34] and specified the injuries as "soil and groundwater contamination due to leaks, spills, and other discharges of produced saltwater, drilling fluids, hydrocarbons, and other contaminants associated with the drilling and production of [oil and gas] wells."[35] Additionally, the Notices pointed the finger at Hunt Oil and specified the exact wells that caused the injury.[36]

---

[32] [Id. at p. 7].
[33] [Id. at p. 5].
[34] [Doc. Nos. 21-7, 21-8].
[35] [Id.].
[36] [Id.].

11

The Landowner's primary objection focuses on whether they had *actual* knowledge of the damages and whether they had knowledge to the full extent of the damages—two lumps of evidence that exceed Hunt Oil's burden. The relevant question is not when did the Landowners obtain the test sample results that revealed the contamination's severity. Instead, the relevant question is when did the Landowners acquire enough information that, if pursued, "led to the true condition of things." *Marin*, 48 So. 3d at 284. That may happen when "the injured party discovers who or what caused" the property damage. *S. Cent. Bell Tel. Co. v. Texaco, Inc.*, 418 So. 2d 531, 532 (La. 1982).

The Notices speak for themselves. The Landowners pinpointed the alleged injuries, causes, and culprits as early as March 29, 2022 and April 14, 2022. Whether the Landowners had *actual* knowledge is beside the point when the Notices showed enough knowledge to put the Landowners "on guard or call for inquiry." *Hogg*, 45 So. 3d at 997.

For those reasons, there is no genuine issue of material fact that the Landowners had sufficient knowledge of its alleged injuries starting no later than March 29, 2022 and April 14, 2022. The Landowners waited until August 28, 2023, to file their LEQA claims, which were subjected to a one-year prescription period. Consequently, the Landowners' LEQA claims are time-barred.

Therefore, Hunt Oil's Motion is **GRANTED** to the extent it seeks to discard the Landowners' LEQA claims.

### 2. Louisiana's Conservation Laws

Hunt Oil claims that the Landowners "have no right to recover civil penalties, attorney's fees, and damages" pursuant to the citizen suit provisions of the Conservations Laws.[37] The Landowners acknowledge "that [the Conservation Laws] does not expressly provide for damages, fees, or penalties…."[38] So the analysis should stop there. Still, the Landowners claim that such damages, fees, and penalties are available under LEQA.[39] However, as already mentioned, the Landowners' LEQA claims are time-barred. Nor is the statute a vehicle to recoup "damages or penalties based on violations of other environmental laws." Murchison, *Enforcing Environmental Standards*, at 558 n. 397.

Therefore, Hunt Oil's Motion is **GRANTED** to the extent it seeks to discard the Landowners' claims seeking civil penalties, attorney's fees, and damages under the citizen suit provision of the Conservation Laws.

### III. CONCLUSION

For the reasons stated above,

**IT IS ORDERED, ADJUDGED, AND DECREED** that Hunt Oil Company's Motion for Partial Summary Judgment [Doc. No. 21] is **GRANTED**.

MONROE, LOUISIANA, this 6th day of June, 2025.

_____
Terry A. Doughty
United States District Judge

---

[37] [Doc. No. 21-2, p. 2].
[38] [Doc. No. 25, p. 27].
[39] [Id.].

14